**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:22-cr-00074-(JMC)** |
| **v.** | : | |
| | : | |
| **MICHAEL GIANOS,** | : | |
| | : | |
| **Defendant.** | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant Michael Gianos to 90 days' incarceration, 36 months' probation, 60 hours of community service, and $500 in restitution.

## I.     Introduction

Gianos, a 35-year-old day trader, participated in the January 6, 2021, attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.8 million dollars in losses.[1]

Gianos pleaded guilty to one count of violating 18 U.S.C. § 1752(a)(1). As explained herein, a sentence of 90 days of incarceration followed by 36 months of probation is appropriate in this case because Gianos: (1) even prior to January 6, expressed his desire to engage in violence

---

[1] As of October 17, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,881,360.20. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

that day—and advocated for others to do the same—in social media and text message conversations; (2) understood the potential for violence that existed on January 6 based on his claimed violent activities at a prior political rally; (3) joined the Proud Boys extremist group before January 6 and went to the Capitol wearing a Proud Boys sweatshirt; (4) on January 6 witnessed violence and the efforts of police officers to dissuade rioters before entering the Capitol, but went inside anyway; (5) entered the Capitol less than ten minutes after the initial breach; (6) while inside, traveled to one of the most sensitive areas within the Capitol, House Speaker Nancy Pelosi's suite of offices; (7) after January 6, sought to cover up his conduct by deleting videos; (8) made aggressive comments on social media following January 6, and has to date failed to demonstrate remorse for his conduct that day.

Gianos's conduct on January 6, like the conduct of hundreds of other rioters, took place in the context of a large and violent riot that physically overwhelmed police officers trying to prevent a breach of the Capitol Building and the disruption of the Joint Session of Congress. Here, the facts and circumstances of Gianos's crime support a sentence of 90 days' incarceration, 36 months' probation, 60 hours of community service, and $500 in restitution.

## II.     Factual and Procedural Background

### *The January 6, 2021 Attack on the Capitol*

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 21 (Statement of Offense), at 1-7.

*Defendant Gianos's Role in the January 6, 2021 Attack on the Capitol*

In December 2020, just weeks before the events of January 6, Gianos contacted Zachary Rehl, a known member of the Proud Boys and a leader of the Philadelphia chapter.[2] Gianos asked Rehl about becoming a Proud Boys member himself and bragged about his prior altercations with members of Antifa in Washington, D.C. He also told Rehl he planned to travel to Washington, D.C. on January 6 and would be "ready for whatever ya need."

| Sent from | Date | Message |
|---|---|---|
| Gianos | 12/26/2020 | Hey Zack merry Christmas bro ! Got ur number from Alex from Vegas chapter . My name Michael not sure if he told you I was gonna reach out |
| REHL | 12/26/2020 | Hey Merry Christmas to you too, he didn't let me know but thats alright! |
| GIANOS | 12/26/2020 | Alright cool he met me out there and I got into a few battles with Antifa back in Dc few weeks ago and he said we want people like you .. told him I'm in he said he would get me a contact |
| GIANOS | 12/26/2020 | Not sure about everything and how it all goes sorry for any stupid questions haha |
| REHL | 12/27/2020 | Just hit up proudboysphiladelphia.com and click apply brotha! |
| GIANOS | 12/27/2020 | I sent the app over just now .. look forward to hearing back |
| REHL | 12/27/2020 | Awesome, I'll get the process rolling on it! |
| GIANOS | 12/27/2020 | Liked "Awesome, I'll get the process rolling on it! " |
| GIANOS | 12/28/2020 | Also my good friend Larry wants to join !! He ready ! I just booked my hotel for Dc were there and ready for whatever ya need |
| REHL | 12/29/2020 | Awesome, just saw this now, maybe we'll see ya down there! |
| GIANOS | 12/29/2020 | Ok cool keep me updated about the process i |

*Figure 1: Gianos asks Rehl about becoming a Proud Boys member and tells him he will be "ready" on January 6.*

---

[2] Rehl was convicted of seditious conspiracy and other felonies for his conduct related to the January 6 attack and is currently awaiting sentencing. *See U.S. v. Nordean et al.*, 21-cr-175-TJK.

Gianos also exchanged text messages with his friend Larry Stackhouse (with whom he would later enter the Capitol building)[3] about travelling to Washington, D.C. He then told Stackhouse he had joined the Proud Boys and that he could get Stackhouse into the group.

| GIANOS | 12/28/2020 | I heard from Rachel ur going to dc? |
|---|---|---|
| Stackhouse | 12/28/2020 | My man, Yessir thats the plan! |
| Stackhouse | 12/28/2020 | U down? |
| GIANOS | 12/28/2020 | Bro I got a hotel. |
| Stackhouse | 12/28/2020 | U wanna fight so bad |
| Stackhouse | 12/28/2020 | I |
| GIANOS | 12/28/2020 | Bro I joined proud boys |
| GIANOS | 12/28/2020 | Hahah going through the initial phase |
| GIANOS | 12/28/2020 | We got mad people going |
| GIANOS | 12/28/2020 | Texas Vegas Chapter |
| Stackhouse | 12/28/2020 | Are u prospecting? |
| GIANOS | 12/28/2020 | Philly chapter |
| GIANOS | 12/28/2020 | Yeah going through the initial BS |
| Stackhouse | 12/28/2020 | How do I join |
| GIANOS | 12/28/2020 | I can def get u in |

*Figure 2: A part of Gianos's text-message conversation with Stackhouse.*

In other text messages with Stackhouse, Gianos described his expectations for what January 6 would hold. Far from envisioning a peaceful political protest, Gianos anticipated a drunken brawl:

| GIANOS | 12/28/2020 | plenty of booze |
|---|---|---|
| GIANOS | 12/28/2020 | We'regonna be going after Antifa |

*Figure 3: Gianos tells Stackhouse what to expect on January 6.*

Gianos also compared his expectations for January 6 with another rally in which he claimed to have beaten an Antifa member bloody:

---

[3] Stackhouse was charged in *United States v. Stackhouse*, 1:21-cr-00240-BAH. He pled guilty to one count of violating 40 U.S.C § 5104(e)(2)(G) and was sentenced to 36 months of probation with special conditions of 14 days' intermittent confinement to be served in two periods of seven days each.

| GIANOS | 12/29/2020 | Gonna be an event |
|--------|------------|-------------------|
| GIANOS | 12/29/2020 | shit gets wild at night |
| Stackhouse | 12/29/2020 | I heard |
| GIANOS | 12/29/2020 | That's when I go hard lol start beating dude with flags |
| GIANOS | 12/29/2020 | Flag was covered in blood |
| GIANOS | 12/29/2020 | Oh shit I trink I sent u one pic I wasn't supposed to lmao |
| Stackhouse | 12/29/2020 | Damn that's a good amount of blood |
| GIANOS | 12/29/2020 | Yeah lol |

*Figure 4: Gianos talks to Stackhouse about the violence he anticipates.*

In Facebook messages with another friend before January 6, Gianos said that he hoped the 2020 election would be overturned and that he planned to fight Antifa on January 6:

| 12/29/2020 | 2:48:08 | Anna | How the heck he's elected |
|------------|---------|------|--------------------------|
| 12/29/2020 | 2:48:21 | GIANOS | I hope on Jan 6th it's overturned |
| 12/29/2020 | 2:48:22 | Anna | I don't get it |
| 12/29/2020 | 2:48:23 | GIANOS | We gonna see |
| 12/29/2020 | 2:48:33 | Anna | I'm praying for that |
| 12/29/2020 | 2:49:58 | GIANOS | U and me both |
| 12/29/2020 | 2:50:04 | GIANOS | 🙏🙏 |
| 12/29/2020 | 2:50:15 | GIANOS | I'm gonna be there fighting Antifa and praying we win |

*Figure 5: Gianos talks to another friend about the 2020 election.*

In Facebook messages with Rachel Myers, with whom Gianos would also breach the Capitol on January 6,[4] Gianos told her that Trump's rally on January 6 would not be "a place for women":

| Michael Gianos | 12/22/2020 | U going ? |
|----------------|------------|-----------|
| Rachel Myers | 12/22/2020 | I want to! |
| Michael Gianos | 12/22/2020 | To be honest it not a place for women |

*Figure 6: Gianos's Facebook conversation with Myers before January 6.*

---

[4] Myers was charged as co-defendant with Gianos in this case. On November 15, 2022, she pleaded guilty pursuant to a plea agreement to one count of violating 40 U.S.C § 5104(e)(2)(G) and on February 16, 2023, the Court sentenced her to 24 months of probation.

He also told Myers that he was a Proud Boy and planned to wear Proud Boys attire:

| Rachel Myers | 12/28/2020 | You think you are a trump supporter cuz you walk on the sheets with the proud boys |
|---|---|---|
| Michael Gianos | 12/28/2020 | Meee?! Uneducated ? |
| Rachel Myers | 12/28/2020 | Yet you have no idea what's going on |
| Michael Gianos | 12/28/2020 | Lol walk on the streets I am a proud boy |
| Michael Gianos | 12/28/2020 | Philly chapter |
| Michael Gianos | 12/28/2020 | Can't wear proud boys gear if ur not a proud b out |
| Michael Gianos | 12/28/2020 | Boy |

*Figure 7: Gianos brags to Myers about being a Proud Boy.*

In other texts and Facebook messages, Gianos called the 2020 election "stolen," sent Myers a tweet from Rudy Giuliani in which Giuliani claimed to have evidence of election fraud, and made plans with Myers and Stackhouse to attend the "Stop the Steal" rally in Washington, D.C.

On January 5, 2021, Gianos drove to Washington, D.C. and stayed overnight in a local hotel. The next morning, on January 6, he met with Myers and Stackhouse at the rally on the Ellipse before walking to the Capitol building. Throughout the day, Gianos wore a black hoodie with a yellow lining (known to be Proud Boys' colors) and a picture of a yellow coiled snake with the words "DON'T TREAD ON ME."



*Figure 8: A screenshot from open-source video depicts Gianos wearing the Proud Boys hoodie just outside the Capitol on January 6. Figure 9: A photo from the search of Gianos's home where the same sweatshirt was recovered.*

Once Gianos arrived on the west side of Capitol grounds, he witnessed several altercations between rioters and police. He watched as rioters jostled with lines of police clad in body armor, and he used his cellphone to film police officers firing crowd-control munitions at unruly members of the crowd.

At approximately 2:13 p.m., rioters first forced their way into the U.S. Capitol. The first rioter to enter the building jumped through a broken window next to the Senate Wing Doors. Gianos walked through those same doors just nine minutes later, at 2:22 p.m. In doing so, he walked past broken glass and debris while a blaring alarm sounded. His travelling companions, Myers and Stackhouse, had entered just seconds before him.



*Figure 10: Screenshot from Interior Surveillance Camera Footage showing Gianos entering the Senate Wing Doors at 2:22 p.m.*

Gianos travelled from the Senate Wing Doors through the Crypt and then upstairs to the second floor of the Capitol, where he proceeded through the Rotunda and Statuary Hall to Speaker Nancy Pelosi's Office Suite. Inside the Speaker's Suite, Gianos stood just feet away as he watched another rioter kick in the doors to a private office.



*Figure 11: Screenshot from Interior Surveillance Camera Footage showing another rioter kicking in the Speaker's Conference Room door. Gianos and Myers stood in the hallway to the left, just feet away.*



*Figure 12: Screenshot from Interior Surveillance Camera Footage shows Gianos enter the Speaker's Conference Room.*

The door having been kicked opened for him, Gianos entered the private room. Inside, he filmed video of other protesters amid the intimate space of the Speaker's office. He also filmed video of a computer on a conference room desk, to which he would later refer in his internet postings as "Pelosi's," and say that he "watched them take her labtop [sic]."



*Figures 13, 14, 15: Screenshots taken from video Gianos captured on his cellphone while inside the Speaker's suite of offices. Visible in the middle image is the laptop Gianos claimed to have seen stolen.*

A few minutes later, Gianos left the Speaker's suite hallways and proceeded back down

the same staircase he had come up, returning to the Crypt and proceeding to a nearby exit.



*Figure 16: Screenshot from open-source video showing Gianos leaving the Speaker's suite. A placard bearing the Speaker's title and name is visible over Gianos's head.*



*Figure 17: Screenshot from Interior Surveillance Camera Footage Showing Gianos (in yellow) with Stackhouse and Myers (in red) in the hallways near Speaker Pelosi's suite.*

Ultimately, Gianos left the Capitol building at 2:36 p.m. after having been inside for about 14 minutes.

Later that evening and the following day, Gianos bragged about "storm[ing]" Speaker Nancy Pelosi's office and having seen Pelosi's computer being stolen in Facebook messages:

| 01/06/2021 | 21:44:11 | GIANOS | Yeah I was in there |
|---|---|---|---|
| 01/06/2021 | 21:44:16 | GIANOS | Stormed Nancy office |

| 01/07/2021 | 1:36:46 | GIANOS | I watched them take her labtop |
|---|---|---|---|
| 01/07/2021 | 1:44:35 | Marie | Who's laptop |
| 01/07/2021 | 1:44:39 | Marie | U went inside |
| 01/07/2021 | 1:44:41 | GIANOS | Pelosi |

*Figures 18 and 19: Several of Gianos's Facebook messages following January 6.*

Gianos also texted that he "took over the capital" and that the Capitol riot "got out of hand."

| 01/06/2021 | 11:55:37 PM | 2157153208 | 6094686142 | Yeah bro shit got wild man |
| 01/06/2021 | 11:55:41 PM | 2157153208 | 6094686142 | Took over the capital |
| 01/06/2021 | 11:55:46 PM | 2157153208 | 6094686142 | Woman got shot |
| 01/06/2021 | 11:55:51 PM | 2157153208 | 6094686142 | Bro it got out of hand |

*Figure 20: Gianos's text messages with a friend on the night of January 6.*

Gianos texted further with Stackhouse and admitted he had deleted videos from inside the

U.S. Capitol ("deleted a lot of shit").

| GIANOS | 01/07/2021 | U get home ok |
| Stackhouse | 01/07/2021 | Just got home |
| Stackhouse | 01/07/2021 | Yo u have any good videos from inside |
| GIANOS | 01/07/2021 | Nah deleted lot of shit |

*Figure 21: Gianos's text messages with Stackhouse on January 7.*

When Stackhouse told Gianos that he didn't regret his actions on January 6, and said

"fuck the government," Gianos agreed whole-heartedly:

| GIANOS | 01/07/2021 | Man so much crazy shit happen |
| Stackhouse | 01/07/2021 | Don't regret one thing |
| Stackhouse | 01/07/2021 | Fuck the government |
| GIANOS | 01/07/2021 | Yeah man I feel the same about that shit |

*Figure 22: Gianos's text messages with Stackhouse on January 7.*

*The Charges and Plea Agreement*

On November 22, 2021, the United States charged Gianos by criminal complaint with

violating 18 U.S.C. § 1752(a)(1) and (2) and 40 U.S.C. § 5104(e)(2)(D) and (G). On December 1,

2021, law enforcement officers arrested him at his home in New Jersey. On March 8, 2022, the

United States charged Gianos by four-count Information with violating 18 U.S.C. § 1752(a)(1)

and (2) and 40 U.S.C. § 5104(e)(2)(D) and (G). On April 28, 2023, pursuant to a plea agreement,

Gianos pleaded guilty to Count One of the Information, charging him with a violation of 18 U.S.C.

11

§ 1752(a)(1). By plea agreement, Gianos agreed to pay $500 in restitution to the Architect of the Capitol.

### III.    Statutory Penalties

Gianos now faces sentencing on a single count of violating 18 U.S.C. § 1752(a)(1). As noted by the plea agreement and the U.S. Probation Office, Gianos faces up to one year of imprisonment and a fine of up to $100,000. He must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

### The Sentencing Guidelines and Guidelines Analysis

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

The government agrees with the Sentencing Guidelines calculation set forth in the PSR. According to the PSR, the U.S. Probation Office calculated Gianos's adjusted offense level under the Sentencing Guidelines as follows:

| | |
|---|---|
| Base Offense Level (U.S.S.G. §2B2.3(a)) | 4 |
| Specific Offense Characteristics (U.S.S.G. §2B2.3(b)(1)(A)) | +2 |
| Acceptance of Responsibility (USSG §3E1.1(a)) | -2 |
| Total Adjusted Offense Level | 4 |

*See* PSR at ¶¶ 36-46.

The U.S. Probation Office calculated Gianos's criminal history as a category I. PSR at ¶ 51. Accordingly, the U.S. Probation Office calculated Gianos's total adjusted offense level, after acceptance, at level 4, and his corresponding Guidelines imprisonment range at 0-6 months. PSR at ¶ 46. Gianos's plea agreement includes an agreed-upon Guidelines' calculation that mirrors the U.S. Probation Office's calculation.[5]

Here, while the Court must consider the § 3553 factors to fashion a just and appropriate sentence, the Guidelines unquestionably provide the most helpful benchmark. As this Court knows, the government has charged a considerable number of persons with crimes based on the January 6 riot. This includes hundreds of felonies and misdemeanors that will be subjected to Guidelines analysis. In order to reflect Congress's will—the same Congress that served as a backdrop to this criminal incursion—the Guidelines are a powerful driver of consistency and fairness.

## IV. Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. In this case, as described below, the Section 3553(a) factors weigh in favor of 90 days' imprisonment.

### A. The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while

---

[5] In the plea agreement, the parties estimated that the defendant's Criminal History Category to be II, while the PSR calculated his Criminal History Category as I. *See* Plea Agreement at 5 and PSR ¶5. Because the resulting Guidelines calculation of 0-6 months remains the same whether Gianos's Criminal History Category is I or II, the Government does not contest the PSR Criminal History Category calculation.

staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Gianos's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for a misdemeanor defendant like Gianos, the absence of violent or destructive acts is not a mitigating factor. Had Gianos engaged in such conduct, he would have faced additional criminal charges.

One of the most important factors in Gianos's case is his expectation and advocacy for violence on January 6. While other protesters may have envisioned attending a passive political rally, Gianos's stated expectations were far from peaceful. He planned to be "going after Antifa," and "fighting Antifa," and said that he would "go hard" and "start beating dude with flags." *See Figures 3,4, and 5,* above. When Gianos arrived at the Capitol on January 6, he witnessed police officers and rioters engaging in violent confrontations, but those observations did nothing to deter him from breaching the building.

Gianos's self-proclaimed membership in the Proud Boys extremist group also presents a serious aggravating factor. He joined the Proud Boys organization just days before January 6 after conversing with a high-ranking member in the group, and expressly stated his willingness to support the Proud Boys on January 6. *See Figure 1*, above. Gianos wore his affiliation on his chest that day by donning a black and yellow sweatshirt, a clear sign of where his affiliations and intentions lay. *See Figures 8 and 9*, above.

Gianos's behavior upon entry into the Capitol is even more aggravating. He entered the building quickly—within ten minutes of the initial breach—and traveled into one of the most intimate places in the Capitol, the Speaker's suite. He bragged about what he did and saw there, telling people on social media that he "stormed Nancy office" and "watched them take her labtop

[sic].” *See Figures 18 and 19*, above. Gianos entered the Speaker's Conference Room after watching another rioter kick down the door. While Gianos roamed the Speaker's Suite with impunity, Speaker Pelosi's staffers hid in fear from the rioters under a table, in the dark, behind a barricaded door just a short distance away.[6]

Accordingly, the nature and the circumstances of the defendant's offense warrant a sentence of incarceration in this matter.

### B.  The History and Characteristics of Gianos

As set forth in the PSR, Gianos's criminal history consists of a conviction for violating a Peace and Good Order statute and a conviction for Possession of a Controlled Substance. PSR at ¶¶ 49-50.

Notably, Gianos has also previously been charged with obstructing a government investigation by destroying evidence. After he was arrested for the conduct that resulted in his Possession of a Controlled Substance conviction, Gianos called the arresting police department and asked about the status of his cell phone, which the police department had seized. In an apparent attempt to convince the police to give his phone back to him, Gianos told the police officer he spoke with that he had changed all of his account information and remotely deleted everything from his accounts. As a result, Gianos was charged with Tampering with Evidence and Obstruction. Those charges were later dismissed, presumably as a part of Gianos's guilty plea to the Possession charge.

---

[6]    *See*    https://www.washingtonpost.com/nation/2021/01/11/pelosi-60-minutes-capitol-impeachment/ ("As a pro-Trump mob beat down the door to House Speaker Nancy Pelosi's office on Wednesday, her staff ran into a conference room, barricaded the door, switched off the lights and cowered under a long table. Eight of them stayed there for 2½ hours as rioters pounded on the door and ransacked and defaced the speaker's office, Pelosi told "60 Minutes" on Sunday.") (retrieved 1/27/23).

Gianos apparently took similar steps after January 6. In a text exchange with Stackhouse, when Stackhouse asked if Gianos had any videos inside the Capitol, Gianos replied "nah deleted lot of shit." *See Figure 16*, above. Gianos's repeated efforts to obstruct government investigations in order to evade the consequences of his actions and evident lack of respect for the rule of law demonstrate a very real need for specific deterrence in the form of incarceration.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be

deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President.

The gravity of these offenses demands deterrence. *See United States v. Mariposa Castro*, 1:21-cr-00299 (RBW), Tr. 2/23/2022 at 41-42 ("But the concern I have is what message did you send to others? Because unfortunately there are a lot of people out here who have the same mindset that existed on January 6th that caused those events to occur. And if people start to get the impression that you can do what happened on January 6th, you can associate yourself with that behavior and that there's no real consequence, then people will say why not do it again."). This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss). And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

Gianos's words and actions before, during, and after January 6 demonstrate the need for specific deterrence in this case. He exhibited violent rhetoric before January 6, and then, after witnessing violence on Capitol grounds, rushed into a restricted building. The Court should send a clear message to this defendant that violence is not acceptable in an orderly society. His membership in the violent Proud Boys organization, who fomented discord on January 6, must be

deterred as well. Gianos also has not shown any remorse for his conduct on January 6, although he has had ample opportunity to do so.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[7] This Court must sentence Gianos based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

Gianos has pleaded guilty to Count One of the Information, charging him with Entering or Remaining in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(1). This offense is a Class A misdemeanor. 18 U.S.C. § 3559. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C.A.  § 3553(a)(6),  apply to Gianos.

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct".  So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United*

---

[7] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

*States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity.

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id.* ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6)."). If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the

defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

For instance, in *United States v. Annie Howell,* 21-CR-217 (TFH), Judge Hogan sentenced the defendant to 60 days' intermittent confinement as a condition of probation. Howell pleaded guilty to a violation 18 U.S.C. § 1752(a)(1), the same charge Gianos did, and the government recommended two months of incarceration. As Gianos did, Howell prepared for violence before January 6 and also met with members of the Proud Boys. She witnessed violence between rioters and police before she entered the Capitol, and filmed those events on her cellphone, as did Gianos. Howell also showed no remorse for her conduct after January 6, and likely destroyed evidence after the event by deleting social media posts and resetting her cellphone, in a manner similar to that of Gianos (although the court in the *Howell* case did apparently credit the defendant for meeting with the House Select Committee).

*United States v. Blake Reed,* 21-CR-204 (BAH) is another comparable case. In *Reed*, the defendant also pleaded guilty to a violation 18 U.S.C. § 1752(a)(1), and the government recommended 90 days of incarceration. There, the defendant discussed joining the Proud Boys before January 6; Gianos went further, and in fact did join the group. Reed also continued to press forward towards the Capitol as he saw other rioters physically attacking police, similar to Gianos's breach of the Capitol building after seeing rioters clash with officers. Reed traveled nearly the

same route through the Capitol as Gianos, entering through the Senate Wing Door, moving through the Crypt and up to the Speaker of the House's office suite—stopping outside the area Gianos entered. Also like Gianos, after January 6, Reed destroyed evidence of his actions on January 6 by deleting information from his mobile telephone and social media accounts. Chief Judge Howell sentenced Reed to 42 days' imprisonment plus three months' home confinement.

In *United States v. Lawrence Stackhouse*, 21-CR-240 (BAH), Chief Judge Howell sentenced Stackhouse, who accompanied Gianos to Washington, D.C. and was with Gianos during much of his journey through the Capitol building, to 36 months of probation with special conditions of 14 days intermittent confinement. That case presents a somewhat useful comparator, but does not encompass the full breadth of Gianos's culpability. First, Gianos (like Howell and Reed described above) pleaded guilty to 18 U.S.C. § 1752(a)(1), a Class A misdemeanor, while Stackhouse pleaded guilty to 40 U.S.C. § 5104(e)(2)(G), a Class B misdemeanor with a lower maximum period of incarceration. Moreover, Gianos sought to guide Stackhouse's association with the Proud Boys extremist group in the days before January 6. Likewise, Stackhouse tried to join the Philadelphia chapter of the Proud Boys by soliciting guidance on the application process from Gianos. While Stackhouse followed a route through the Capitol building substantially similar to that of Gianos, entering through the Senate Wing Doors at the same time and travelling to the Speaker's office suite, Gianos's violent rhetoric, both before and after January 6, was more extreme than that of Stackhouse. Gianos also claimed to have deleted videos from January 6, an aggravating factor that sets his case apart from Stackhouse's.

Gianos's conduct is also substantially more culpable than that of Myers, his codefendant in this case. Like Stackhouse, and unlike Gianos, Myers pleaded guilty to one count of violating 40 U.S.C. § 5104(e)(2)(G). Furthermore, Gianos's violent discourse before January 6 was more

detailed than Myers's and was backed by his claims of having been violent in past protests ("That's when I go hard lol start beating dude with flags . . . Flag was covered in blood") and threats to engage in additional violence on January 6 ("I'm gonna be there fighting Antifa and praying we win"). And where Myers had only a tangential affiliation with the Proud Boys organization, Gianos claimed to be a full-fledged member ("Can't wear proud boys gear if ur [sic] not a proud b out [sic] . .. Boy"). There also is no evidence that Myers destroyed evidence of her conduct on January 6, as Gianos admittedly did ("Nah deleted lot of shit").

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

## V.   Restitution

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to

restitution under the VWPA).[8] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Gianos must pay $500 in restitution, which reflects in part the role Gianos played in the riot on January 6.[9] Plea Agreement at ¶ 12. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,881,360.20" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of October 2022. *Id.* Gianos's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See* PSR ¶ 115.

---

[8] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," and any offense "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

[9] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

**VI.    Conclusion**

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Defendant to 90 days' incarceration, 36 months' probation, 60 hours of community service, and $500 in restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior, while recognizing his acceptance of responsibility for his crime.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:    */s/ Eric Boylan*
ERIC W. BOYLAN
Assistant United States Attorney
Texas Bar No. 24105519
601 D Street N.W.
Washington, DC  20002
Tel:  (202) 815-8608
Email: eric.boylan@usdoj.gov

*/s/ Craig Estes*
CRAIG ESTES
Assistant United States Attorney
Massachusetts Bar No. 670370
United States Attorney's Office for the District of
Massachusetts (detailee)
Tel:  (617) 748-3100
Email: craig.estes@usdoj.gov